

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

March 24, 2025

**BY ECF**
The Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> Re:     *United States v. Thomas Little II,* **24 Cr. 452 (AT)**

Dear Judge Torres:

The Government respectfully submits this letter in advance of the April 7, 2025 sentencing in this matter. In his sentencing submission, the defendant, Thomas Little II, seeks a sentence of time served, approximately 8 months' imprisonment. Dkt. 50. The Government and the Probation Office respectfully request that the Court impose a Guidelines sentence of 2 years' imprisonment, the statutory maximum.

## I.     Background

### A.   The Underlying Offense

In January 2022, the defendant was a passenger in the front seat of a car that was pulled over for speeding in Arizona. *United States v. Little II*, No. 22 Cr. 84 (D. Ariz.), Presentence Investigation Report dated March 16, 2022 ("PSR") ¶ 5. The defendant and the driver represented to police that they were the only people in the car. *Id.* But four Mexican citizens without proper U.S. documentation were found in the backseat and the trunk of the car. *Id.* ¶ 6. The Mexican citizens advised law enforcement that they had arranged to be smuggled into the United States, and two of them identified the defendant as the individual in the car that had picked them up to complete their entry into the United States. *See id.* ¶ 8. On May 18, 2022, the defendant was sentenced to 21 months' imprisonment and three years' supervised release, following his conviction for conspiring to transport illegal aliens for profit, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(ii), and 1324(a)(1)(B)(i). *United States v. Little II*, No. 22 Cr. 84, Dkt. 52 (D. Ariz.). On or about July 21, 2023, the defendant was released from custody and commenced his term of supervised release in this District.

### B.  The Instant Violation of Supervised Release

In July 2024, the defendant was a passenger in the front seat of a car that was pulled over for speeding in Idaho. Hearing Tr. ("Tr.") 15:20-17:12. The police officer smelled a "strong odor" of marijuana and thus proceeded to search the car. *Id.* 17:19-3. During the search, the officer found, among other things: (1) what appeared to be "felony drugs," *id.* 25:3-14; (2) a Browning .22 caliber pistol ("Firearm-1") with its magazine, recovered from under the defendant's seat, GXs 104, 104A; (3) a Heckler & Koch .45 caliber pistol ("Firearm-2") recovered from under the driver's seat, GX 101; and (4) two shotguns, a Mossberg model 500 12-guage shotgun ("Firearm-3") and a GForce model 500 12-guage shotgun ("Firearm-4," collectively, the "Firearms"), both of which were recovered from the trunk. GX 102, 103. Photographs of the Firearms are depicted below.

 

(Firearm-1 and -2 recovered from under the defendant's front passenger and driver's seat)





(Firearm-3 and -4 recovered from the trunk)

On or about August 1, 2024, Probation Officer Matthew Omlor submitted a Violation Report that includes six specifications: (1) unlawful possession of a firearm under Idaho law (Specification One, Grade A violation); (2) possession of a controlled substance under Idaho law (Specification Two,

Grade C violation); (3) possession of a firearm in violation of a condition of supervised release (Specification Three, Grade A violation); (4) possession of a controlled substance under federal law (Specification Four, Grade A violation; (5) travel from the District without approval in violation of a condition of supervised release (Specification Five, Grade C violation); and (6) association with a convicted felon in violation of a condition of supervised release (Specification Six, Grade C violation). A hearing was held on January 27 and 28, 2025, and during that hearing and again in his sentencing submission, the defendant highlighted that Idaho prosecutors had moved to dismiss a purportedly related case against the defendant "'in the interest of justice.'" Dkt. 50, at 3. As the Government has previously pointed out, the circumstances surrounding the prosecution's motion to dismiss are ambiguous because an Idaho court ultimately dismissed that action "pursuant to the plea agreement of the parties." DX E.

In any event, last month, this Court found the defendant liable on Specifications One, Three, Four, and Five. Dkt. 47. Because the defendant was originally convicted of a class C felony, the statutory maximum is 2 years' imprisonment. 18 U.S.C. § 3583(e)(3). The Guidelines range for Specifications One, Three, and Four would be 30 to 37 months' imprisonment, U.S.S.G. § 7B1.4(a), but, because the statutorily authorized maximum term of imprisonment that is imposable upon revocation (24 months) is less than the minimum of the applicable range (30 months), the statutorily authorized maximum term (24 months) is substituted for the applicable range. *Id.* § 7B1.4(b)(1). Specification Five has a Guidelines range of 7 to 13 months' imprisonment. *Id.*

## II.    Discussion

The applicable 18 U.S.C. § 3553(a) factors warrant a 2-year sentence to reflect the nature and circumstances of the defendant's conduct and the continued breach of the Court's trust, to appropriately account for the defendant's history and characteristics, and to afford adequate deterrence.

### A.    Applicable Law

When imposing a sentence for a violation of the terms of supervised release, a court must consider certain factors set forth in § 3553(a), including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant, and the applicable Guidelines range. *See* 18 U.S.C. §§ 3553(a), 3583(e). In fashioning the appropriate sentence, the "primary goal" is "to sanction the violator for failing to abide by the conditions of the court-ordered supervision," to account for the breach of trust inherent in failing to follow the court-imposed conditions of supervised release. U.S.S.G. ch. 7, pt. A, introductory cmt. 3(b). Thus, "at revocation the court should sanction primarily the defendant's breach of trust, while taking into account, to a limited degree, the seriousness of the underlying violation and the criminal history of the violator." *Id.*; *see United States v. Ramos*, 979 F.3d 994, 1002 (2d Cir. 2020).

### B.    The Statutory Maximum Is Appropriate to Vindicate the Purposes of Sentencing.

*First*, the history and characteristics of the defendant are particularly concerning. The defendant has been convicted of at least eight felonies: grand larceny in New York County in 2010, for which he

was sentenced to 5 years' probation, PSR ¶ 24; attempted robbery in Queens County in 2010, for which he was sentenced to 5 years' probation, *id.* ¶ 25; attempted criminal possession of a controlled substance with intent to sell in New York County in 2011, for which he was sentenced to 1 year of imprisonment, *id.* ¶ 26; robbery (two counts) and attempted robbery in Nassau County in 2013, for which he was sentenced to 8 years' imprisonment, *id.* ¶ 27; promoting prison contraband, for the possession of marijuana and a weapon while incarcerated in Nassau County in 2014, for which he was sentenced to 2 to 4 years' imprisonment, to run concurrent with the previous sentence, *id.* ¶ 28; and conspiracy to transport illegal aliens for profit in Arizona in 2022, for which he was sentenced to 21 months' imprisonment and 3 years' supervised release. *United States v. Little II*, No. 22 Cr. 84, Dkt. 52 (D. Ariz.).

*Second*, the nature and circumstances of the instant offenses show a flagrant breach of the Court's trust. On July 22, 2024, Officer Omlor attempted to conduct a home visit at the defendant's residence; however, the defendant claimed that he was at work in New Jersey and therefore unavailable. GX 402, at 25. Officer Omlor's file suggests that he would have had no reason to doubt the defendant's excuse as the defendant had previously advised Officer Omlor about his tri-state travel for work. For example, on three occasions from December 2023 to January 2024, the defendant notified Officer Omlor that, while driving his truck for work, he had been subject to traffic stops or involved in an accident. *Id.* at 16, 17, 20. In May 2024, the defendant reported to Officer Omlor that he continued to handle deliveries "throughout the tristate area." *Id.* at 23. On July 4, 2024, the defendant alerted Officer Omlor that he had received a traffic citation during work in New Jersey. *Id.* So, no red flags would have been raised weeks later, on July 22, 2024, when the defendant, after having built up trust with Officer Omlor, explained that he was at work in New Jersey during Officer Omlor's attempted home visit. Instead, we now know that the defendant took advantage of that trust and ended up over 2,000 miles away from this District in a car with two handguns and two shotguns.

Further, there can be no claim of a momentary lapse in judgment. On July 22, 2024, the defendant was reminded of the seriousness of supervised release and his obligations to the Court when Officer Omlor appeared at the defendant's home in the Bronx to conduct an inquiry connected to the defendant's supervised release. The timing here is critical because by July 22, 2024, the defendant had almost certainly planned his travel to Idaho, which began on or before July 28, 2024, or at least planned such travel shortly after receiving Officer Omlor's notice to conduct the home visit. Thus, the defendant faced a choice: adhere to the conditions of his supervised release or travel to Idaho and end up in a car with guns and drugs. The defendant chose to deceive the Probation Office and placed himself in a dangerous situation.

*Third*, a 2-year sentence is necessary to ensure adequate deterrence to the defendant. 18 U.S.C. § 3553(a)(2)(B). It is clear that, over the years, the defendant has failed to abide by conditions of release. When the defendant committed the underlying offense in Arizona in 2022, he was on New York State parole, which had not approved any relocation to Arizona. PSR ¶ 15. His parole officer noted that the defendant "was [only] marginally compliant with supervision" and "was difficult to locate." *Id*. Still, in connection with the sentencing in the underlying case, which resulted in a below-Guidelines sentence, the defendant, through counsel, maintained that his Arizona conviction had already deterred him from committing any future crimes: "Mr. Little has learned his lesson; he is specifically deterred from committing any more crimes, ever again." *United States v. Little*, 22 Cr. 84,

Dkt. 45, at 6. Yet less than three years later, the defendant was caught traveling in a car with the Firearms, thus violating federal and state laws and the conditions of his supervised release. Further, his disregard for authority continued even during his pre-trial detention in the instant matter. On November 30, 2024, while at the MDC, the defendant refused to obey an order and thus loss commissary privileges, pending 45 days of clear conduct. Accordingly, the statutory maximum of a 2-year sentence, which is substituted for the Guidelines range, will help send the message that repeatedly failing to abide by court orders, disregarding the fundamental terms of supervised release, and breaching the Court's trust will continue to result in significant terms of incarceration.

### C. The Defendant's Contentions Do Not Support a Sentence of Time Served.

#### 1.    The Defendant Did Not Have an Excellent Year on Supervised Release.

In his sentencing submission, the defendant argues for a sentence of time served based on his excellent year on supervised release, the conditions he endured at the MDC, and the death of his brother. Dkt. 50, at 1-2, 4. As an initial matter, the Government does not agree that the defendant had an excellent year while on supervised release. The defendant tested positive for marijuana on three occasions, GX 402, at 11, 13, 15, and he was also reprimanded by the Probation Office for accepting an out-of-District job without the Probation Office's approval. *Id.* at 14.

#### 2.    The MDC Allegations Do Not Support a Time-Served Sentence.

With respect to the MDC, the defendant maintains that, for the past five months, he has been subjected to maggot-infested food, violence, lockdowns, and medical neglect. Dkt. 50, at 2. Those allegations do not support a sentence of time served.

#### a.    Food Quality

The Government first learned of the defendant's claim about food only in reading the defendant's sentencing submission. The background of this claim is noteworthy and unfortunate. Last month, the *Daily News* published an article claiming that there were maggots in the food at the MDC.[1] The article was based entirely on a photo allegedly taken at the MDC, which was provided to the *Daily News* by the Federal Defenders. The photo does not establish that food at the MDC has been infested with maggots. Among other things, the photo is undated and unverified; was not attached to a court filing but provided directly to the press; and showed maggots in beans, which were not served at the MDC on the photo's purported date. The Government hopes that, in the future, the defendant will raise with the Bureau of Prisons or with the Government any issues the defendant is experiencing with his food at the MDC.

---

[1] John Annese, *New Photo Shows Maggot-Infested Food in MDC Brooklyn Jail, Where Diddy and Luigi Mangione Are Held*, Daily News, https://www.nydailynews.com/2025/02/21/new-photo-shows-maggot-infested-food-in-mdc-brooklyn-where-diddy-and-luigi-mangione-are-held (Feb. 21, 2025).

### b.  General Conditions

There is evidence that the conditions at the MDC have improved since the defendant began his pre-trial detention. The Honorable Valerie E. Caproni, United States District Judge for the Southern District of New York, made this observation earlier this year: "[To those who claim that the] MDC is a horrible place, and it's awful, and [inmates are] going to be locked down forever, that's just not true anymore. All of those decisions [regarding MDC conditions] were months ago." *United States v. Alon Alexander*, 24 Cr. 676 (VEC), Tr. 125:6-9 (S.D.N.Y Jan. 16, 2025). Judge Caproni's reflection on the timing of court opinions criticizing the MDC is consistent with the dates of the decisions cited by the defendant in an effort to establish that the MDC's troubles continue. The decisions relied on by the defendant were issued in January and August of 2024. *See* Dkt. 50, at 3 (citing *United States v. Chavez*, 710 F. Supp. 3d 227, 228-30 (S.D.N.Y. 2024); *United States v. Tontisabo*, 21 Cr. 701 (LAK), Dkt. 77 (S.D.N.Y. Jan. 12, 2024); *United States v. Colucci*¸ 2024 WL 3643857 (GRB) (E.D.N.Y. Aug. 5, 2024). In addition, especially relevant to this case is Judge Caproni's recognition that the MDC has actually increased its medical staff: "There's a lot more staffing at the MDC. The number of defendants who are ending up in lock down for substantial periods of time are minimal. . . . They've got a lot more medical staff, and they're doing the best they can." *Alexander*, 24 Cr. 676, Tr. 125:9-21.

### c.  Alleged Medical Neglect

The effects of the increased medical staff mentioned by Judge Caproni may be evident in the defendant's case and refute his allegations that the MDC has neglected his medical needs, for example, by failing to provide him physical therapy. The defendant's claim of neglect should be viewed in the context of the record in this case and the defendant's medical records, all of which indicate that the MDC did not neglect the defendant's foot injury.

Specifically, the record indicates that, before committing the instant offenses, the defendant was a truck driver who was not hampered by a foot injury. Even before his supervision was transferred to this District, the defendant had obtained a commercial driver's license for employment purposes. GX 402, at 1. To that end, in July 2023, the defendant asked Officer Omlor about the prospects of an "over-the-road" truck-driving job, but Officer Omlor suggested local driving jobs given the underlying offense of smuggling undocumented citizens. *Id.* at 4. By October 2023, the defendant had obtained a job as a "warehouse worker," working Mondays through Fridays from 12:00 p.m. to 8:00 p.m. *Id.* at 13. In addition, at about the same time, he also claimed to be delivering perishable items approximately two to three times a week, which involved "overnight" work and "making deliveries" throughout the tri-state area. *Id.* at 14. By January 2024, he was purportedly working sixteen-hour shifts. *Id.* at 19. In March 2024, he was supposedly working two jobs, with his primary job involving "driving tractor trailers to transport goods throughout the tri-state area overnight." *Id.* at 21. He reported that his hours for his principal employment and second job were 10:00 a.m. to 5:00 p.m. and 12:00 a.m. to 8:00 a.m., respectively. *Id.* at 23.

In June 2024, the defendant reported to Officer Omlor that he had re-injured his right foot exiting the cab of his truck. Officer Omlor summarized his conversation with the defendant: "[The defendant] explained that he had a preexisting injury for which he had several surgeries on his right foot. . . . [The defendant] relayed that he underwent medical evaluation and that there isn't anything

that can be done aside from managing the pain." *Id.* at 24. In July 2024, the defendant continued to drive a truck but was also arrested for his crimes in Idaho and ultimately transferred into federal custody. *Id.* at 24-25.

The defendant was detained and arrived at the MDC on or about November 5, 2024. Dkt. 50, at 3. In his sentencing submission, he claims that the MDC has neglected to provide him with physical therapy and medication. Dkt. 50, at 4. The record does not support these claims.

As an initial matter, the defendant acknowledges that the MDC is currently providing him with medication (Gabapentin) for his pain. *Id.* Ex. A. Yet without citation to anything, the defendant faults the MDC for failing to provide him Oxycontin, even after MDC medical staff had advised him in early January 2025 that he was not approved for opiate medication. Ex. A, at 1.

Weeks before the MDC provided that information to the defendant, he was examined by MDC medical staff on December 12, 2024. The defendant reported to the staff that he had received physical therapy before his incarceration, and he requested physical therapy and an examination for chronic pain management. Ex. B, at 2. Later that same day, defense counsel similarly requested physical therapy for the defendant from MDC's legal staff, citing—without any documentation—the defendant's physical therapy two to three times per week before he had been incarcerated. Ex. C (Email from Ariel Werner to Sophia Papapetru et al. (Dec. 12, 2024 4:39 p.m.)). Nevertheless, on December 13, 2024, MDC legal staff forwarded defense counsel's request to MDC medical personnel. *See id.* Email from Rachel Kull to Ariel Werner et al. (Dec. 13, 2024 7:00 a.m.)).

MDC records reflect that, on or about January 2, 2025, MDC medical staff examined the defendant. During that exam, he explained that he had been taking Oxycodone for pain for one year and had previously been on Percocet for four years. Ex. A, at 1. MDC staff observed that the defendant "did not appear to be in any evident pain" and indicated to the defendant that he was not approved for opiate medication. *Id.*

Four days later, MDC medical records memorialized an assessment by a physical therapist who recommended against physical therapy: "I reviewed Little's chart, and *I do not think that he is appropriate for PT at this time*. . . . He will need to be managed from a chronic pain standpoint. . . . Once he is evaluated by the provider, if there is a specific issue that needs to be addressed, please let me know." Ex. D (emphasis added and second ellipsis in original). Still, on January 7, 2025, defense counsel reiterated her request for physical therapy, Ex. C (Email from Ariel Werner to Rachel Kull et al. (Jan. 7, 2025 1:03 p.m.)), and, that same day, MDC legal advised that physical therapy had been approved. *Id.* (Email from Rachel Kull to Ariel Werner et al. (Jan. 7, 2025 1:12 p.m.)). Despite this initial approval, as discussed below, a doctor would agree with the MDC physical therapist that physical therapy was unnecessary.

Medical records reflect that, on February 5, 2025, during an MDC medical assessment, the defendant self-reported that he had previously taken Oxycodone and Gabapentin and that he had requested "pain mgmt." from the MDC. Ex. E, at 1. The records for another exam the following day note that the defendant was "in no acute distress." Ex. F, at 2. At about the same time, the MDC sent the defendant's medical release to a nationwide pharmacy, requesting the defendant's prescription

history for the past five years; the pharmacy reported that no such records existed. Ex. G.

On February 11, 2025, the defendant was seen by a pain management specialist, who was affiliated with Medical Center-1. Ex. H. The records from that visit note (1) that there was *"[n]o need for PT at this time"*; (2) that the defendant's medications would "continue"; and (3) that a follow-up appointment had been scheduled for March 11. *Id.* at 3 (emphasis added). The next day, an MDC doctor added the following to the defendant's record: "[I]f pain management made no changes to this medication, there is no need for them to see him in three months[. W]e can follow up in house," Ex. I; as noted, the pain management specialist had "continued" the medications. The MDC doctor further noted that "[the defendant] really needs to be fitted for proper foot wear [sic] and to see podiatry." *Id.* The Government has been advised that the defendant currently has two outside appointments pending with a podiatrist and prosthetic specialist.

On March 12, 2025, at approximately 10:19 a.m., the defendant used an MDC email service to ask questions about his medical care: "I've been told multiple times I'm going to see the provider but when is the question?? The provider . . . has been on my floor numerous times and tells me I'm not on the list!! Also the pull [sic] line does'nt [sic] even show up on time daily to give me my meds> Sometimes the pill line does'nt [sic] show up at all. This is all documented and my lawyer knows and my judge will be made aware of the medical neglect. I'm not even getting any physical therapy and the physician at [Medical Center-1] requested I have physical therapy weekly. When can I start therapy? Who is the head of the medical staff at mdc Brooklyn??? I'm not obtaining adequate medical care." Ex. J. At approximately 2:45 p.m., the MDC responded: "You have two outside appointments pending for your foot., [sic] You are also scheduled to see the doctor[. The provider who has been on your floor] is a Nurse Practitioner, so this appointment [with the doctor] is a higher level of care. The consult you had for Physical Therapy did not recommend therapy. These issues can be discussed when you see the provider. Due to security concerns & in conjunction with BOP policies, the times, dates and locations of medical appointments ae [sic] not shared with inmates." *Id.*

Just days ago, on March 18, 2025, the defendant was examined by an MDC doctor. The defendant described the pain in his foot as a "10." Ex. K. As a result, the doctor increased the defendant's medication and provided him a TENS unit (a small electric device placed on a person to relieve pain). The doctor also scheduled a follow-up appointment in three weeks to assess the defendant's response to the increase in medication and directed that the defendant immediately return for an assessment if his condition worsened.[2] *Id.*

The defendant's claims about the MDC are insufficient. The medical records indicate that MDC medical staff has been monitoring the defendant's foot injury. And multiple medical opinions have concluded that physical therapy is not necessary at this time. Accordingly, none of these factors support a sentence of time served.

---

[2] The defendant claims that he requested therapy and psychology support after the death of his brother on January 1, 2025. Dkt. 50, at 4. The Government notes that the defendant was examined by MDC medical staff on January 21, 2025, and reported no mental health complaints. Ex. L, at 3. The Government did locate a medical record summarizing the defendant's health problems that included an "Unspecified Depressive Disorder" as of March 13, 2025, and an "Unspecified mood [affective] disorder" as of January 2, 2025. Ex. M (alteration in original).

### III.    Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a 2-year sentence of imprisonment.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney

By:    s/ Daniel Roque
Daniel K. Roque
Special Assistant United States Attorney
(212) 637-1946

cc:    Ariel Werner, Esq. (by ECF)
U.S. Probation Officer Alexandria Hirsch (by email)