P474LITS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                      24 Cr. 452 (AT)

THOMAS EARL LITTLE II,

                                        Sentence
                Defendant.

------------------------------x

                                        New York, N.Y.
                                        April 7, 2025
                                        3:40 p.m.


Before:

                    HON. ANALISA TORRES,

                                        District Judge

                        APPEARANCES

MATTHEW PODOLSKY
     United States Attorney for the
     Southern District of New York
DANIEL K. ROQUE
     Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK, INC.
     Attorneys for Defendant
BY:  ARIEL C. WERNER

Also Present:
ALEXANDRIA HIRSCH, U.S. Probation

P474LITS

(Case called)

MR. ROQUE:  Good afternoon, your Honor.  Daniel Roque on behalf of the government.  With me is Probation Officer Alexandria Hirsch.

MS. WERNER:  Good afternoon, your Honor.  Federal Defenders by Ariel Werner for Mr. Little.

THE COURT:  Please be seated.

This matter is on for sentencing.  On January 27th and 28th of this year the Court held an evidentiary hearing on Specifications One through Five of the violation report, dated August 1, 2024.  These specifications stem from Mr. Little's arrest during a July 28, 2024, traffic stop in Jefferson County, Idaho.  In a written order, dated February 26, 2025, the Court found by a preponderance of the evidence that Mr. Little violated the conditions of his supervised release as alleged in Specification One, unlawful possession of a firearm in violation of Idaho Code Sections 18-3316, Specification 3, possession of a firearm in violation of the terms of supervised release, Specification Four, felon in possession of a firearm in violation of 18 United States Code, Section 922(g)(1), and Specification 5 by leaving the judicial district without permission.

In connection with today's sentencing on Specifications One, Three, Four and Five I have reviewed the violation report, dated August 1, 2024, Mr. Little's sentencing

P474LITS

submission, dated March 17, 2025, including his letter and the letter from his mother, the government's sentencing submission, dated March 24, 2025, including the 13 exhibits, and the evidentiary record.

Have the parties received each of these submissions?

MR. ROQUE:  Yes, your Honor.

MS. WERNER:  Yes, your Honor.

THE COURT:  Are there any further submissions?

MR. ROQUE:  Not from the government.

MS. WERNER:  No, your Honor.

THE COURT:  Although courts are no longer required to follow the sentencing guidelines, we are required to consider the applicable guidelines in imposing sentence.  To do so it is necessary that we accurately calculate the sentencing range. The August 1 violation report states that Specifications One, Three, and Four are Grade A violations, that each carry a guidelines range of 30 to 37 months' imprisonment, and Specification Five is a Grade C violation that carries a guidelines range of 7 to 13 months' imprisonment.

Each specification carries a statutory maximum term of 24 months' imprisonment.  Specifications One, Three, and Four, because the statutorily authorized maximum term of imprisonment of 24 months is less than minimum of the applicable guidelines range of 30 to 37 months' imprisonment, the statutorily authorized maximum term shall be substituted for the applicable

P474LITS

guidelines range.  See, sentencing guideline Section 7B1.4(b)(1).

Neither the government nor Mr. Little contests these guidelines ranges.

Based on my independent evaluation of the guidelines, I come to the same conclusion as probation regarding the appropriate guidelines ranges.

Now, I will hear from the parties.

Does the government wish to be heard with regard to sentencing?

MR. ROQUE:  Yes, your Honor.  Two factors we would like to highlight from our submission.  For the reason that the probation office and the government are seeking two years' imprisonment here, I think a notable context here is a little bit of background for the breach of trust in this case.  At the beginning of the defendant's supervised release term, he makes we'll call it a mistake and fails to advise probation about an out-of-district employment.  Probation admonishes the defendant, and he is given a chance after that mistake.

It appears, based on the record, that he builds the trust back up from the probation office, advising them of jobs that are out of state, advising them if there are incidents that happen out of state.

And then on July 22, 2024, he gets notice from the probation office that basically says -- I haven't read it or

P474LITS

quoting it, but it says, we're here. We're here for a home visit. And at that point the defendant has a choice. He is either on his way to Idaho, or he is going to be making plans to go to Idaho shortly. And he chooses to breach the trust that he built up and misleads the probation office by claiming he is at work in New Jersey.

And then lastly, your Honor, I think deterrence is especially relevant here. Because the defendant has not been deterred from committing violations while he is on conditions of supervised release. The underlying offense occurred while he was on New York State parole. He received a below-guidelines sentence for that offense. And now there has been more crimes while on supervised release. And again, the defendant seeks a below-guideline sentence after previously claiming to counsel that he would be deterred and not commit any further crimes.

Your Honor, it's the government's position that the defendant has not been deterred. And for these reasons and those reasons in our papers, the government and probation are recommending two years' imprisonment followed by one year of supervised release.

MS. WERNER: Thank you, your Honor.

I'd like to start, your Honor, by acknowledging Mr. Little's family members who are here in the courtroom. We are joined by his mother, Josephine DeJesus. We are joined by

P474LITS

his sisters Merna and Serine.  And we are joined by his brother, Marcus.  Several of them traveled to be here, and we are very appreciative.  Mr. Little has other supporters waiting for him in the community.  He has a girlfriend of many years. He has a daughter.  He has friends.  He has a community that stands ready to receive him.

Your Honor, we are requesting a sentence of time served, that is about eight and a half months, nearly eight and a half months.  And on the facts of this case, given the conditions of the MDC, given the nature of the violation, given Mr. Little's medical needs, given the loss that he and his family sustained during his term of incarceration, given his good conduct during the first year of his supervision, for all of those reasons, time served is enough.

Now, it's been a few months since the hearing in this case.  I know the Court is familiar, but I do want to emphasize, briefly, the extent of what Mr. Little was found guilty of.  He was found guilty of having left the district without the Court's permission.  He was found guilty of constructive possession of at least one firearm.  But there was no proof in this case, nor could there be, that Mr. Little was involved in any other crime.  This is not a case involving victims.  This is not a case involving a robbery or domestic violence or anything of that nature.  This is a case where Mr. Little was found in a car that contained firearms.  He is

P474LITS

very remorseful for that.  And he recognizes that he did breach the Court's trust.  But it is a different case from one where someone is out committing crimes of a violent nature using firearms.

The conditions that Mr. Little has been held under throughout most of his time since July of 2024, have been just abysmal.  We have seen in not only this case, but in many recent cases, the government go to great lengths to try to undercut stories of suffering and inhumane conditions from MDC. It is a shame, to say the least, that the government has the response of showing so much disdain and disbelief for the lived experiences of the people that it seeks to cage, rather than listening to them.  And I wish that the government would put as much effort into trying to improve the conditions at the MDC -- if it put that same amount of effort, the same amount of effort it puts into submissions like this --

THE COURT:  Are you saying that in this particular case that the government has downplayed the unacceptable conditions at MDC?

MS. WERNER:  Absolutely, your Honor.  They have downplayed the conditions at MDC in a way that is, I think the Court can see, I'm almost offended by it.  I am offended by it.

We don't have pictures of the bugs Mr. Little found in his food on numerous occasions because Mr. Little has never possessed a contraband cell phone, so he could not document it.

P474LITS

Nonetheless, he did sit down to trays that had maggots in them. We have a statement by the government saying that Mr. Little had 45 days of commissary taken away because he refused an order.  But what we don't see from the government is what was that order?  It was to get off the phone with his family immediately as the facility was going into yet another one of its incessant lockdowns.

The government makes the claim, citing Judge Caproni in an opinion back in January, that conditions of the MDC are improving.  But the government does not mention that since Judge Caproni made those comments, which was before the inauguration of the most recent administration and since the start of this administration's attack on the federal workforce the Bureau of Prisons has announced that its employees will be seeing significant pay cuts and that many incentive programs that have been put in place to boost retention of employees within the Bureau of Prisons have been canceled, that has led to mass resignations within the Bureau of Prisons.  And what we've seen at the MDC is that we are back to seeing incessant lockdowns, back to lockdown conditions every weekend just because the facility does not have enough staff to run.  So for the government to cite an opinion or a comment in court from January 16th and say, "see, it's better" when the lived experiences of the people on the inside are instead that they are locked down, that there are maggots in their food, that as

P474LITS

recently as February someone is getting stabbed within the walls. These are conditions that shock the conscience. These are not the conditions that the sentencing commission contemplated when formulating the guidelines. These are not the conditions when Congress contemplated when setting the maximums that individuals can face when they are charged with a violation. These are conditions that are far more punishing than anyone envisioned.

That is particularly the case for Mr. Little, given his medical care. And that is something else that the government has seriously downplayed here, the extent of his medical situation. Mr. Little has serious chronic pain from a devastating injury that he sustained as a child, a traumatizing injury, frankly. He's had many surgeries throughout his life. He has learned to make the most of it. He has learned to work through the pain. He has learned to not throw a fit when things happen like I've seen happen at the MDC, where a guard takes away his cane when on the way to meet me in the visiting room and so instead we have to meet in a public place because he can't cross the distance of the meeting room without a cane. He soldiers through this pain with a great deal of strength, but it's been a lifelong struggle for him.

On the outside, Mr. Little was receiving gabapentin and oxycodone. I recognize that there are problems associated with long-term opiate use. Mr. Little recognizes that opiates

P474LITS

can be abused as well.  But for people with pain like Mr. Little's opiates play a critical role in their care.  For him what the oxycodone did was it provided immediate relief from his pain.  The gabapentin, he explains to me, helps improve the pain for a matter of hours.  But what the oxycodone did was it made it bearable.  It made it possible for him to work.  It made it possible for him to move around and made it possible for him to work and to live more of a normal life, particularly with the physical therapy he was doing as many as three times a week.  That was his care regimen on the outside, the oxycodone, gabapentin, and physical therapy.  We agree, MDC has provided him with gabapentin, but it's not enough.  And Mr. Little has been in agony.  He told his mother, in fact, that he was thinking it was time for him to request for his foot to be amputated.  And that was, I think, shocking for her to hear as a mother.  One can only imagine what pain Mr. Little must have been in to express that sentiment.

The records that the government cites in its submission, I think they actually do a good job of showing what it's like to try to raise problems like this to the MDC.  I would write to the MDC and say, "Mr. Little needs physical therapy."  No response.  I would write again, "Mr. Little needs physical therapy."  I would finally get a response.  "We agree.  He has seen medical.  He does need physical therapy.  He is on a waiting list."  Another month passes.  "Has Mr. Little gotten

P474LITS

the physical therapy?"  "No.  He's still on the waiting list." Meanwhile, another provider writes a note saying, "Well, I think he doesn't actually need it."  That's convenient because they are not providing it.  So when I see records like the ones cited by the government, it does not show to me that the MDC is providing adequate care.  It shows to me that the MDC often tries to create a record to justify its neglectful medical care.

The records that show outside appointments being scheduled are meaningless because what I understand is that when outside appointments are scheduled, they are not honored. In early March, after Ms. DeJesus told me that Mr. Little was complaining of pain so severe that amputation was on his mind, I wrote to MDC Medical and I said, "he needs to see someone a lot sooner. I see in the record he is supposed to see an outside provider on March 11.  Can he see someone sooner?"  MDC legal wrote back promptly, I was pleased to see.  And they said "we will try to get him in sooner."  Not only did that not happen, but when March 11 came around, he was not taken to see that specialist.  And he's never seen one since then.  He saw one in February.  They said bring him back to see us again in March.  That did not happen.  So I do not place any stock on notations saying that outside appointments are being scheduled.

The government also, in a footnote, mentioned that Mr. Little did not ask for psychological care; that's not so.

P474LITS

The records that I have show that on January 28, Mr. Little did ask to be placed on a referral list to see a psychologist or a therapist to process the grief that he was experiencing following the death of his younger brother.  That never happened either.  He never saw anyone.

And that brings me to another reason why this period of incarceration has been so punitive for Mr. Little.  This is not the government's fault.  This is not the Bureau of Prisons's fault, but during this term of incarceration, Mr. Little and his family suffered a shocking tragedy in the loss of his younger brother.  It was unexpected.  It happened on New Year's Day.  He was a police officer, and he also worked another job.  And I don't know all of the circumstances, but it was just a devastating loss.  Mr. Little was and remains grateful that the Court gave him the opportunity to attend his brother's funeral.  It was very meaningful for him to have the opportunity to spend that day with his family, to attend the viewing and attend the service.  And even still, the last few months of soldiering through and processing this grief on his own have been unspeakably difficult.

Not only have these months been difficult, but they have also been an opportunity for introspection by Mr. Little. When you process a loss as devastating as the unexpected loss of a little brother while you are sitting behind bars as a result of decisions you have made, it forces you to think about

P474LITS

your actions.  And I know from my many conversations with Mr. Little that has been the case for him.  He knows that time is fleeting.  He knows that life is short.  He does not want to spend more time sitting in custody as opposed to with his daughter, with his siblings, with his mother.

The purpose of sentencing, as the Court knows, on the violation of supervised release is to punish a breach of trust. That's the primary reason we are here.  Mr. Little recognizes that he did breach the Court's trust.  He has been amply punished for that breach.

When Mr. Little returned to the MDC following his brother's funeral, he showed that he is still a person who deserves the Court's trust.  He is a person who respects the Court's authority.  He is a person who made a mistake.  But he is a person who is eager to do better and to prove that he can do better.

The sentence he received on the underlying case was 21 months.  A sentence for two years, even longer than that for a violation of supervised release would be excessive.  It would certainly be excessive.  The eight and a half months that Mr. Little has spent at the MDC under these punitive conditions deprived of adequate medical care while suffering through the grief of losing his brother, that has been enough time to punish his breach of trust and to deter him from future wrongdoing.

P474LITS

It is important that Mr. Little succeeded for his first year of supervision.  We reject the government's assertion that his performance that first year was anything less than commendable.  If doing a treatment program or a treatment assessment that probation orders, finding employment, and staying out of trouble, not incurring any new arrests for a year is not success on supervised release, then I don't know what is.  Mr. Little was succeeding.  There is no proof that Mr. Little was anywhere other than working in New Jersey on July 22nd.  The government wants to create some record of Mr. Little as a person who was just overall ignoring the Court's authority and making mistakes all over the place.  But that is not so.  This is a person who was trying to do right.  He made a tremendous mistake when he left the district.  He made a tremendous mistake when he placed himself in situation being in a car that has firearms.  But he is remorseful for that.  And he stands ready to try again, and he would be deeply grateful for the Court's trust in a second attempt.

THE COURT:  Mr. Little, would you like to say something?

THE DEFENDANT:  Yes.

Good afternoon, your Honor.  First thing, I want to thank you for allowing me to attend my brother's funeral.  I appreciate it.  Thank you so much.

I'm sorry for my wrongdoings.  I'm sorry for leaving

P474LITS

the district and being in that car without permission.  I look forward to doing better.  And I understand that time is limited and at any given moment, anyone can run out of time.  And I need to use my time better.  Thank you.

THE COURT:  First, I want to extend my deepest sympathy to Mr. Little and Ms. DeJesus and the other members of the family for the loss of your beloved brother.

Is there any reason why a sentence should not be imposed at this time?

MR. ROQUE:  No, your Honor.

MS. WERNER:  No, your Honor.

THE COURT:  As I have stated, the guidelines range to be used for Specifications One, Three, and Four is 24 months' imprisonment.  And the guidelines range to be used for Specifications Five is 7 to 13 months' imprisonment.

Under the Supreme Court's decision in *Booker* and its progeny, the guidelines range is only one factor that I must consider in deciding the appropriate sentence.  I'm also required to consider the other factors set forth in 18 United States Code, Section 3553(a), which are referenced in 18 United States Code, Section 3583(e).  These include, first, the nature and circumstances of the offense and the history and characteristics of the defendant.  Second, the need for the sentence imposed to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the

P474LITS

defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  Third, the guidelines range, fourth any pertinent policy statement, fifth, the need to avoid unwarranted sentence disparities among defendants with similar records who've been found guilty of similar conduct, and sixth, the need to provide restitution to any victims of the offense.

Ultimately, I'm required to impose a sentence that is sufficient but not greater than necessary to comply with the purposes of sentencing that I've just mentioned.  I have given substantial thought and attention to the appropriate sentence in this case.  Probation recommends a sentence of 24 months' imprisonment to be followed by a new term of supervised release.  The government also advocates for a sentence of 24 months.  Mr. Little seeks a sentence of time served and one year of supervised release.

On one hand, there is support for a sentence of 24 months' imprisonment.  This is not Mr. Little's first offense. He has been convicted of least eight felonies, including robbery, promoting prison contraband, and conspiracy to transport illegal aliens.

Unfortunately, Mr. Little has not learned from his mistakes.  While on supervised release, he traveled to Idaho without permission from probation or the Court.  After a

P474LITS

two-day evidentiary hearing, the Court found by preponderance of the evidence that while in Idaho, Mr. Little possessed at least one firearm in violation of state law, federal law, and his conditions of release.  When he committed these violations, Mr. Little had just finished serving a below-guideline sentence of 21 months' imprisonment for conspiring to transport illegal aliens.  He therefore not only breached probation and the Court's trust, but also took advantage of the Court's leniency in sentencing him to a below-guidelines sentence for the underlying offense.

On the other hand, there are mitigating factors that support a below-guideline sentence.  Immediately after beginning his term of supervised release, Mr. Little trained for and obtained his commercial driver's license.  He was then able to maintain steady employment as a full-time truck driver.

Mr. Little has now been detained at the MDC for more than four -- well, I understand it's, you say eight and a half months now?

MS. WERNER:  He's been in custody for eight and a half months.  He's been at the MDC since November.

THE COURT:  He writes that he has degenerative bones in his foot and severe arthritis, stemming from a gruesome accident that partially severed his foot when he was nine years old.  And that being in MDC has effected his medical conditions severely.  According to Mr. Little, at MDC he has been given

P474LITS

medication that is different than what was prescribed by his doctor, and he is in constant pain as a result.  He also emphasizes how hard it has been to reach out to family and schedule social visits in light of the lockdowns in MDC. Indeed, Courts in this circuit have recognized that the extraordinarily harsh conditions of confinement at MDC counsel in favor of a shorter overall sentence.  *United States v. Chavez*, 23-CR-303, 2024 WL 50233, at *1-7 (S.D.N.Y. Jan. 4, 2024).

The Court also accounts for the fact that Mr. Little has taken responsibility for his actions, as reflected by his letter and his statements today and a letter submitted by his mother, Josephine DeJesus.  Mr. Little writes that after tragically losing his brother earlier this year, he wants to step up to help his mom and his two nieces and support them financially.  Mr. Little's mother writes that Mr. Little is a very loving, kindhearted, and intelligent person who looks after her and their family.  She recounts multiple telephone conversations in which he has emphasized that he wants to turn his life around and never face prison again.  She further writes that the recent death of her other son, combined with the incarceration of Mr. Little has completely destroyed and fragmented her family.  She asks the Court to give Mr. Little a chance at honoring his brother and making amends and moving forward.

P474LITS

Accordingly, I conclude for the reasons stated, that a sentence below the guidelines range is warranted, as to Specifications One, Three, Four, and Five.

Mr. Little, please rise for the imposition of sentence.

It is the judgment of this Court that you are sentenced to time served with respect to each specification with no supervised release to follow.

Does either attorney know of any legal reason why the sentence should not be imposed as stated?

MR. ROQUE:  No, your Honor.

MS. WERNER:  No, your Honor.

THE COURT:  The sentence, as stated, is imposed.  That is the sentence of the Court.

Mr. Little, you have a right to appeal.  The notice of appeal must be filed within 14 days of the judgment of conviction.  If you are not able to pay the cost of an appeal, you may apply for leave to appeal *in forma pauperis.*

Does the government wish to make an application regarding remaining specifications?

MR. ROQUE:  Yes, your Honor, just to dismiss Specification No. Six.

THE COURT:  Specification Six is dismissed.

Are there any further applications?

MR. ROQUE:  Not from the government, your Honor.

P474LITS

MS. WERNER:  No, your Honor.  Thank you.

THE COURT:  Mr. Little, I have been doing this work for 25 years.  And many times when a person is being sentenced, there is no one in the room supporting them, no family, no friends.  But in your case, you have your mother and you have your other relatives here who obviously love you and want the best for you.  So I'm hoping that you will not use poor judgment as you have in the past.  What I'm hoping is that you will continue to work and lead a law-abiding life.

Do you understand?

THE DEFENDANT:  Yes, your Honor.  Thank you so much.

THE COURT:  The matter is adjourned.

(Adjourned)